793 A.2d 839

IN THE MATTER OF CODE ENFORCEMENT
OFFICER (M00410), JERSEY CITY.

IN THE MATTER OF PROGRAM MONITOR
(M62780), JERSEY CITY.

IN THE MATTER OF COMMUNITY SERVICE AIDE/SENIOR
CLERK (M6631A), JERSEY CITY.

Superior Court of New Jersey
Appellate Division

Submitted March 5, 2002—Decided April 1, 2002.

Before Judges PRESSLER, WEFING and PARRILLO.

*Pearce, Vort & Fleisig,* attorneys for appellant *James E. Ganley* in A–318–00T5 (*Robert A. Vort,* on the brief).

*Patrick Johnston,* appellant pro se in A–711–00T5, A–1995–00T3 and A–3121–00T5.

*David Samson,* Attorney General, attorney for respondent the Merit System Board in all four appeals (*Michael J. Haas,* Assis-

tant Attorney General, of counsel; *Elizabeth M. Laufer*, Deputy Attorney General, on the briefs).

The opinion of the court was delivered by

PARRILLO, J.A.D.

These four appeals, consolidated for purposes of this opinion, present a series of challenges to final administrative decisions of the Merit System Board (Board) granting appointment waivers for various civil service positions after examination and compilation by Jersey City of lists of eligibles and their certifications. Three of the appeals are brought pro se by Patrick Johnston, who was on the list of eligibles for three positions, i.e., Community Service Aide/Senior Clerk, Program Monitor, and Code Enforcement Officer. The fourth appeal is brought by James Ganley, by counsel, challenging the appointment waiver for the position of Code Enforcement Officer. For reasons that follow, we affirm the Board's grant of an appointment waiver for the position of Program Monitor, but reverse its determinations with respect to Community Service Aide/Senior Clerk and Code Enforcement Officer and remand for further proceedings consistent with this opinion.

All four appeals involve common questions concerning the use of eligible lists in the merit system's appointment, selection, and placement process. Some general background is therefore in order. To implement the state constitutional mandate that appointments and promotions in the civil service of the State and its political subdivisions be made according to merit and fitness to be ascertained by competitive examination, *N.J. Const.* art. VII, § 1, ¶ 2, the Legislature created the Department of Personnel (Department) as a principal department within the executive branch of government and further established the Merit System Board and Commissioner of Personnel as integral parts of the Department. *N.J.S.A.* 11A:2–1; *N.J.S.A.* 11A:2–8. The Board has the authority to assign and reassign titles; the Commissioner of Personnel has broad supervisory power to review classification plans governing

all positions in the civil service and to provide for examinations testing candidates' ability to perform the duties of a title. *N.J.S.A.* 11A:2–3 to –7; *N.J.S.A.* 11A:3–1; *N.J.S.A.* 11A:4–1 to – 16.

Vacancies in the civil service are filled by promotional examination, *N.J.S.A.* 11A:4–2, which the Commissioner is authorized to announce and administer. *N.J.S.A.* 11A:4–1(a). The examination process is triggered by either the appointment of a provisional to a civil service position or the appointing authority's request for a list to fill a vacancy. *N.J.S.A.* 11A:4–5. Based on the outcome of the examination, along with other factors, the Commissioner provides for the establishment, certification, and cancellation of eligible lists of candidates. *N.J.S.A.* 11A:4–4. Once the examination process has been initiated and there is a complete certification, the appointing authority is required to make appointments from the list, in accordance with the "rule of three"[1], "unless otherwise permitted by the Commissioner for valid reason such as fiscal constraints." *N.J.S.A.* 11A:4–5.[2] In other words, it is only under certain limited circumstances that the Commissioner may grant the appointing authority a waiver of the requirement to make the appointment from the eligible list and, therefore, leave the position vacant in the face of a complete list.

---

[1] The "rule of three" requires that the appointing authority make the appointment from the eligible list if there are three or more interested and eligible candidates, and appoint one of the top three interested eligibles. *N.J.S.A.* 11A:4–8; *N.J.A.C.* 4A:4–4.8. The "rule of three" is intended to "guarantee the appointing authority an opportunity to exercise minimal discretion in the selection of particular employees." *Nunan v. Department of Personnel,* 244 *N.J.Super.* 494, 497, 582 *A.2d* 1266 (App.Div.1990).

[2] The Administrative Code implements the statutory directive and provides that an appointing authority may:

for valid reasons such as fiscal constraints, petition the Commissioner for permission not to make a permanent appointment. The Commissioner may grant such petition, but may order the appointing authority to reimburse the Department for costs of the selection process.

[*N.J.A.C.* 4A:10–2.2(a)2.]

In each of the four appeals before us, the Board granted Jersey City's request for a waiver of appointment ostensibly because of the City's fiscal crisis. It appears undisputed that, in July 1999, Jersey City was designated by the State as a distressed city pursuant to *N.J.S.A.* 52:27D–118.25 and came under the fiscal oversight of the local public finance board within the Department of Community Affairs. On February 9, 2000, Jersey City implemented a reduction-in-force in which thirty-three employees were laid off. With that in mind, we next turn to the individual circumstances surrounding each civil service title at issue here and the Board's decision to leave that position vacant in the face of a complete and certified list.

We approach each instance mindful of our limited role in reviewing administrative action. *Matter of Musick,* 143 *N.J.* 206, 216, 670 *A.*2d 11 (1996). In the search for arbitrary or unreasonable action, the judicial role is generally restricted to three inquiries:

(1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency bases its action; and (3) whether, in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[*Ibid.* (citations omitted).]

*See also In re CAFRA Permit No. 87–0959–5,* 152 *N.J.* 287, 304, 704 *A.*2d 1261 (1997); *Brady v. Board of Review,* 152 *N.J.* 197, 210, 704 *A.*2d 547 (1997); *Gloucester Cty. Welfare Bd. v. New Jersey Civ. Serv. Comm'n,* 93 *N.J.* 384, 398, 461 *A.*2d 575 (1983). By the same token, we are in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue. *Mayflower Securities v. Bureau of Securities,* 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973).

### 1. In the Matter of Program Monitor (M62780)

On September 22, 1997, Jersey City provisionally appointed Stephen Schulz to the title of Program Monitor, pending an open competitive examination. The provisional appointment generated

an examination that was announced in December 1997. On March 12, 1998, an eligible roster was promulgated that contained the names of twelve individuals, including appellant Patrick Johnston, who, without veteran status, tied as the number two-ranked eligible. On June 1, 1999, a complete certification containing the twelve names was issued to Jersey City. Thereafter, Jersey City, through its assistant personnel director, requested of the Board an appointment waiver on the basis that the provisional employee Schulz was no longer working in the Program Monitor position, having resigned effective August 2, 1999, and that the City was not making appointments due to fiscal constraints. On October 13, 2000, the Board granted Jersey City the appointment waiver, finding that the appointing authority had demonstrated a valid reason for not making an appointment from the subject eligible list in light of its designation as a distressed city, its recent reduction in force, and the fact that no provisionals were then functioning in the title.

■ The fact that the City may have continued to employ persons provisionally in other unspecified titles does not detract from the economic justification for withholding current appointment to the position of Program Monitor, left vacant since August 2, 1999. *Communications Workers of America v. State of New Jersey*, 191 *N.J.Super.* 1, 4–6, 465 *A*.2d 519 (App.Div.1983). The appointing authority retains the discretion to determine which areas of municipal government provide mandatory or critical services and which positions could be eliminated during a fiscal crisis. *Melchionne v. Newark*, 60 *N.J.Super.* 104, 121, 158 *A*.2d 411 (App.Div.), *aff'd*, 33 *N.J.* 404, 165 *A*.2d 183 (1960); *Greco v. Smith*, 40 *N.J.Super.* 182, 189–90, 122 *A*.2d 513 (App.Div.1956). And as to the former, the City is entitled to employ provisional employees in titles for which no eligible lists are currently outstanding. *See N.J.S.A.* 11A:4–13.

We are satisfied that the Board's findings with regard to the position of Program Monitor are supported by sufficient credible

evidence in the record, and we therefore affirm. *See In re Taylor,* 158 *N.J.* 644, 656–58, 731 *A.*2d 35 (1999).

For reasons that follow, however, we are unable to reach this same conclusion with respect to the Board's other determinations as to the positions of Community Service Aide/Senior Clerk and Code Enforcement Officer.

## 2. In the Matter of Community Service Aide/Senior Clerk (M6631A)

On February 3, 1997, Jersey City appointed three provisionals—Charles Allen, Iris Vivanco, and Teasa Williams—to the dual position Community Service Aide/Senior Clerk, pending an open competitive examination that was not announced until February 1999. After the examination was conducted, an eligible list was promulgated on April 29, 1999 containing twenty-three names, including appellant Johnston, a non-veteran, who ranked number two eligible. As for the provisionals already in position, non-veteran Allen ranked number twenty-one on the list, whereas Vivanco and Williams did not apply to take the examination. After a complete certification was issued to Jersey City on April 29, 1999, the appointing authority requested an appointment waiver. Claiming that the three provisional employees were no longer working in the subject position, Jersey City cited projected layoffs and fiscal constraints as justifications for proposing not to make an appointment. Allen had resigned his position effective July 31, 1999 and, on August 2, 1999, Vivanco and Williams were appointed to Community Service Aide/Typing positions at slightly higher salaries than their provisional positions of Community Service Aide/Senior Clerk, from which they were removed. Vivanco has since resigned.

Before the Board, Johnston argued against an appointment waiver, contending that the titles of Community Service Aide/Typing and Community Service Aide/Senior Clerk are identical despite their separate classification listings. Indeed, the Board agreed that Jersey City's actions in provisionally appointing Vivanco and Williams to the typing position, after removing them

from the "similar" senior clerk position where they had remained for over one and one-half years, was an attempt "to circumvent merit system appointment requirements." While acknowledging that the "record would justify the denial of an appointment waiver," nevertheless the Board granted the relief because "it would not be appropriate to order an appointment under these particular circumstances"—an obvious reference to Jersey City's fiscal condition.

We disagree with the reasoning of the Board as violative of both express and implied legislative policies. As noted, those policies dictate that appointments and promotions in the civil service be made according to merit and fitness, measured as far as practicable by competitive examination. If, as alleged, the two positions of senior clerk and typing are indeed functionally equivalent, then Jersey City's fiscal condition provides no justification for a waiver of appointment to a position that is essentially occupied by a provisional who has remained in the title for well over the one year period allowed by law, *N.J.S.A.* 11A:4–13(b), to the preclusion of those eligible candidates who legitimately qualified for the position through competitive examination. If, on the other hand, the two positions are in fact separate and distinct, then the appointing authority's fiscal situation more than amply supports the grant of waiver.

Of course, the problem here is that the record below does not allow a finding either way. There is, for instance, no proof of the job descriptions for each title or the duties performed by each position. As the record stands, Jersey City's facially suspect action in changing the job title of the three provisionals from "senior clerk" to "typing," after they had served as senior clerk for nearly one and one-half years and only three months after the Department certified the complete list of eligibles for the former position remains unexplained and, worse yet, unjustified. This undeveloped record has prevented the Board, in this instance, from carrying out, within the broad supervisory powers delegated to it, its statutory mandate to regulate the public work force.

Therefore, we reverse the Board's grant of an appointment waiver for the position of Community Service Aide/Senior Clerk and remand for a determination as to the identity of the dual titles and effectuation of an appropriate remedy in the event they are found to be the same or functionally equivalent.

### 3. In the Matter of Code Enforcement Officer (M00410)

■ We reach the same result in the matter of the position of Code Enforcement Officer, where it appears, absent any explanation from the City, that the appointing authority may have acted even more egregiously.

Prior to October 1996, the position in question was designated "Code Enforcement Officer/Program Monitor." On July 15, 1996, Jersey City provisionally appointed Michael Daphnis to this position, pending an open competitive examination. On October 11, 1996, Jersey City posted a notice for the job of "Code Enforcement Officer," in accordance with *N.J.S.A.* 11A:4–5. Appellants James Ganley, a veteran and city resident, and Patrick Johnston sat for the examination and ranked first and second, respectively, of all candidates. On December 13, 1996, based on the result of the examination, an eligible roster was promulgated containing the names of nine eligibles including Ganley and Johnston. On January 6, 1997, a complete certification, containing the nine names, was issued to the appointing authority.

Jersey City, however, did not appoint anyone on the eligible list. At some point prior to the promulgation of the eligible list on December 13, 1996, the appointing authority had hired forty-four provisional employees to staff the "Code Enforcement Officer/Program Monitor" positions, which the City changed to "Code Enforcement Officer" positions on October 15, 1996—the very title for which the City had posted a job notice on October 11, 1996. Thereafter, the City hired another provisional Code Enforcement Officer on December 15, 1996 and yet another one on January 6, 1997—the same day the complete certification was issued by the Department.

In any event, after being issued a complete certification, on February 26, 1997 the City requested from the Department an appointment waiver, representing that Daphnis was terminated on October 18, 1996,[3] i.e., prior to the issuance of the certification on January 6, 1997, and that all other provisional appointees who had been serving in the subject title had been removed from their positions. Jersey City's request prompted a review by the Department and, as a result on March 18, 1997, the Department notified the appointing authority that the provisional appointments to the position Code Enforcement Officer, newly titled as of October 15, 1996, were disapproved. Jersey City apparently did not follow the directive, and the Department issued a notice of violation on April 21, 1997. The City evidently still did not comply after the notice of violation and, on May 15, 1997, the Department sent notice that it had disapproved continued compensation for the provisional employees.

In June 1997, approximately six months after promulgation of the eligible list, Jersey City once again changed the titles of these provisional employees back to "Code Enforcement Officer/Program Monitor" and, on June 26, 1997, asked the Department for permission to transfer the provisional Code Enforcement Officers to the new position. Apparently permission was denied because Jersey City had presented no explanation for the changes in title. Nevertheless, as of September 24, 1997, Jersey City continued to employ the forty-two provisional Code Enforcement Officers hired on October 15, 1996,[4] as well as the two others subsequently hired on December 15, 1996 and January 6, 1997.

Despite the fact that the City's initial request for an appointment waiver was made on February 26, 1997 and that for the next two years Ganley continually complained that the City had failed

---

[3] On October 21, 1996, Daphnis was appointed to a non-competitive position of "messenger," at the same salary as his previous position.

[4] Apparently, of the original forty-four provisionals hired on October 15, 1996, two were no longer employed by the City.

to make an appointment from the outstanding certification, the Board took no action [5] until December 23, 1998—over two years after the promulgation of the eligible list—when it advised Jersey City of the waiver process. Almost one year later, on October 20, 1999, Jersey City formally requested waiver of appointment for certification of the Code Enforcement Officer position. As of October 25, 1999, twenty-five provisionals continued to hold the position of Code Enforcement Officer/Program Monitor, while Ganley remained first on the eligible list. That list expired on December 12, 1999, before the Board's resolution of Jersey City's request for a waiver of appointment.

The Board's resolution did not occur until August 10, 2000, eight months after appellants' certification from the December 1996 examination had expired, when it ruled in favor of the appointing authority's request, thereby rendering moot the complaints of appellants and others similarly situated over their non-appointment. In the course of its ruling, the Board found that the sequence of events in twice changing the titles of forty-four provisional employees without explanation "clearly indicates that the actions of the appointing authority were aimed at circumventing merit system appointment requirements." The only consequence of having violated merit system rules, however, was the Board's assessment of compliance costs and fines against the City. Although acknowledging that the record "would justify denial of an appointment waiver," the Board instead granted the waiver of appointment because the list from which exemption was sought had expired on December 12, 1999, the position supposedly had

---

[5] In a December 15, 1997 memo, the Department reported:

Originally pa's were appointed as Code Enforcement Officer/Program Monitor. Then on 10-15-96 the AA sent an interim profile changing the title to Code Enforcement Officer.

A list (M00410) was generated and certified against 44 Pa's. Now the AA has changed the title back to Code Enforcement Officer/Program Monitor. FYI a list (M00430) was generated and certified for the slash title 0L962887 on 12-31-96. The AA has not complied on this matter either. It was sent up for compliance on 6-6-[9]7. Copies are attached for your review.

never been filled, and the City had recently undergone a reduction in force.

As in the case with the position of Community Service Aide/Senior Clerk, we conclude there is not sufficient evidence in the record to support the Board's grant of a waiver of appointment in this instance. As the Board concluded, there was no explanation for the "musical chairs" reclassification of forty-four provisionals from one title to another and back to the original, nor any explanation as to how the functions and duties performed under both titles may have differed from each other. In fact, the Board itself sought no justification from the appointing authority for its double changes in title and multiple transfers of provisionals back and forth. Nor did the Board address other apparent violations by Jersey City of merit system rules, such as leaving uncertified provisionals in positions for more than twelve months, *N.J.S.A.* 11A:4–13(b), appointing provisionals to positions for which there existed a complete list of eligibles, *N.J.A.C.* 4A:4–1.5, and willful failure to act in the face of Department directives, *N.J.A.C.* 4A:10–1.1(b).

Indeed, the economy argument advanced by the City would be of no avail if the appointing authority had in fact decided not to dispense with the particular services rendered by the position for which the examination was called but instead had them performed by provisionals who were moved from the position for which appellants qualified—the only apparent motivation therefor being to avoid use of the eligible list. In such a case, there would be neither an abolition of the subject position nor a dispensation of its services for purposes of economy. *See Melchionne v. Newark, supra,* 60 *N.J.Super.* at 121–22, 158 *A.*2d 411; *Greco v. Smith, supra,* 40 *N.J.Super.* at 189, 122 *A.*2d 513. Under the present circumstances—suggestive as they are of a circumvention of merit system appointment requirements—we conclude that there has been a failure to recognize both the spirit and the legislative policy of the Civil Service Act under which the Board functions, and this alone is reason to reverse its action, even in the absence of express

prohibitory language in the statute. *See Fanwood v. Rocco,* 59 *N.J.Super.* 306, 319, 157 *A.*2d 712 (App.Div.), *aff'd,* 33 *N.J.* 404, 165 *A.*2d 183 (1960); *Greco v. Smith, supra,* 40 *N.J.Super.* at 184–85, 122 *A.*2d 513.

It is simply no answer that, at the time of the Board's decision, no eligible list remained in force. The eligible list expired precisely because of the failure of the appointing authority to timely act, and the Board to timely decide. And the fact remains that, during the life of the list, appellants repeatedly complained of their non-appointment so as not to preclude the provision of relief retroactively. *Cf. N.J.S.A.* 11A:4–6.

We recognize that there is no constitutionally-vested right to appointment to a civil service position simply because of placement on the eligible list, and that appellants are not automatically entitled to the position of Code Enforcement Officer merely because of their eligibility ranking. *Nunan v. Department of Personnel,* 244 *N.J.Super.* 494, 497, 582 *A.*2d 1266 (App.Div.1990). They are, however, entitled to the assurance that, so long as the list remains in force, no appointment will be made except from that list. *In re Crowley,* 193 *N.J.Super.* 197, 210, 473 *A.*2d 90 (App.Div.1984). They are also entitled to be dealt with fairly, which would not have been the case if, as alleged, the appointing authority had by design effectively abrogated the Civil Service Act by either retaining employees in provisional status in positions essentially identical to those for which lists of eligibles had been promulgated and beyond the twelve-month maximum allowed by law, or rotating them through similar positions in circumvention of merit system appointment requirements. Because the record is unclear whether, during the life of the list, persons other than those on that list were appointed to the subject title, we remand the matter to the Board for a determination of this issue and effectuation of a remedial opportunity if found to be necessary. The determination upon remand must include a finding as to whether the position of Code Enforcement Officer entails substantially identical or functionally equivalent duties as a Code Enforce-

ment Officer/Program Monitor; if so, we direct the Board to effectuate an appropriate remedy.

The final administrative action of the Board dated October 13, 2000 as to the position of Program Monitor is affirmed. The final administrative actions by the Board dated August 10, 2000 and January 19, 2001 as to the positions of Code Enforcement Officer and Community Service Aide, respectively, are reversed, and the matters are remanded to the Board for further proceedings consistent with this opinion.